Robert L. CANADY

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.**

**JFM–95–783.**

United States District Court,
D. Maryland.

Nov. 29, 1995.

Ronald B. Greene, Lanham, MD, for plaintiff.

Mark R. Pohl, Carol B. O'Keeffe, Robert L. Polk, Washington Metropolitan Area Transit Authority, Washington, DC, Roger Schlossberg, Hagerstown, MD, Douglas R. Taylor, Debra Aronson, Rockville, MD, for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff Robert L. Canady sues the Washington Metropolitan Area Transit Authority (WMATA), Amalgamated Transit Union AFL–CIO, Local 689 (Local 689), and the Transit Employees Health and Welfare Plan (the Plan) to recover life insurance benefits. The case arises from the denial of plaintiff's claim for $20,000 of life insurance benefits after the death of his wife. Defendants maintain that plaintiff's wife failed to make the contributions required to maintain benefits and had notice that her benefits therefore had been suspended. The parties have filed cross-motions for summary judgment. Although the amount in controversy is relatively small, the issues presented are somewhat tricky.

## I.

Plaintiffs' wife, Tuijuiana McCamey, died on April 19, 1994. As a WMATA employee, she was entitled under the terms of the collective bargaining agreement between WMATA and Local 689 to participate in the Plan. Under the terms of the Plan, employees pay a monthly contribution to maintain a package of benefits, including disability, health, accidental death, and $20,000 in life insurance coverage. Pursuant to a written authorization filed by McCamey, prior to 1988 WMATA automatically deducted Plan contributions from her monthly paycheck.

Beginning in 1988 and continuing for a period of at least one year, McCamey was on disability leave and received workers' compensation instead of a WMATA paycheck. During this period, automatic deductions for Plan contributions were not drawn from McCamey's workers' compensation, and McCamey failed to pay the monthly contribution on her own. On November 16, 1990 the Plan notified McCamey that she owed $1104.79 in past due contributions and that her benefits would be terminated within 30 days if she did not make arrangements to pay. On January 4, 1991, the Plan notified McCamey that her benefits had been suspended.

In June, 1992, McCamey returned to work. Monthly deductions resumed, apparently in amounts larger than before her disability leave. After McCamey's death, the Plan's Trustees denied plaintiff's claim to collect life insurance benefits. The Plan refunded the sum of $245.02 that was withheld from McCamey's salary after she returned from disability.

## II.

Plaintiff claims that Local 689, by failing to assist him in his efforts to recover benefits, breached either the collective bargaining agreement or its duty of fair representation. Plaintiff has not pointed to any specific provision of the collective bargaining agreement that imposed any contractual duty upon Local 689 to assist him. Likewise, he has presented no evidence and pointed to no facts that suggest that the union acted arbitrarily, discriminatorily or in bad faith toward him. Such a showing is necessary to the maintenance of any claim for a breach of the duty of fair representation. *See, e.g., Smith v. DCA Food Indus., Inc.,* 269 F.Supp. 863 (D.Md.1967). Accordingly, Local 689 is entitled to summary judgment.

## III.

WMATA and the Plan first argue in support of their summary judgment motion that plaintiff's claim is barred by a provision of the collective bargaining agreement that prevents members from initiating litigation to challenge benefits determinations. Section 6(c) of the Plan Agreement provides in relevant part:

> Nothing in this Agreement shall be construed to give to any participating member or to any person claiming benefits hereunder any cause of action against the Trustees or the Fund ..., or against the parties to this Agreement. Should any such person institute litigation with respect to any claim under this Agreement against the parties, the Trustees, [or] the Fund ..., that person's rights hereunder shall immediately cease and terminate....

## A.

■ As an initial matter, I note that although this case involves employee benefits and collective bargaining, two areas heavily regulated by federal statute, Maryland law applies. ERISA preemption does not apply because the Plan falls under ERISA's "governmental plan" exemption. *See* 29 U.S.C. § 1003(b)(1) (exempting governmental plans); 29 U.S.C. § 1002(32) ("The term 'governmental plan' means a plan established or maintained for its employees by ... the government of any State or political subdivision thereof, or by any agency or instrumentality [thereof]."); *see also Akins v. WMATA,* 729 F.Supp. 903, 905 n. 1 (D.D.C.1990) (granting summary judgment with respect to ERISA claim because plaintiff conceded that WMATA was governmental entity exempt from ERISA). Although this Plan is the product of a collective bargaining agreement between a public employer and a union, rather than the direct creation of a governmental entity, it remains a "governmental plan" for ERISA purposes. *See Feinstein v. Lewis,* 477 F.Supp. 1256, 1260–62 (S.D.N.Y.1979), *aff'd,* 622 F.2d 573 (2d Cir.1980).

■ Also, although this suit involves interpretation of a collective bargaining agreement, WMATA is not an "employer" for purposes of the National Labor Relations Act. *See* 29 U.S.C. § 152(2) ("The term 'employer' ... shall not include ... any State or political subdivision thereof...."); *see also NLRB v. Princeton Memorial Hosp.,* 939 F.2d 174, 177 (4th Cir.1991) (noting that "political subdivision" includes either entities created directly by State so as to constitute administrative arm or entities administered by individuals responsible to public officials) (citing *NLRB v. Natural Gas Util. Dist. of Hawkins County,* 402 U.S. 600, 604–05, 91 S.Ct. 1746, 1749–50, 29 L.Ed.2d 206 (1971)). The federal common law of collective bargaining agreements therefore does not control this

case. *See generally Textile Workers Union of Am. v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957) (holding that § 301 of the National Labor Relations Act, codified at 29 U.S.C. § 185, preempts state causes of action and mandates creation of federal common law).[1]

## B.

■ In *Food Fair Stores, Inc. v. Greeley,* 264 Md. 105, 285 A.2d 632 (1972), the Maryland Court of Appeals was confronted with the question of the legality of a nonsuit provision in a retail grocery chain's employee benefit plan virtually identical to the provision here in issue. The court ruled that "[t]aken literally, the Plan leaves an employee defenseless and without remedy against anyone who might have, by capricious or arbitrary action, or by fraud, deprived him of his just rights under the Plan. For such an interpretation to be given the sanction or approval by any court would be unconscionable...." *Id.* 285 A.2d at 636. What the Court of Appeals said in *Food Fair Stores* is fully applicable in this case. Thus, defendants' reliance upon the nonsuit provision is therefore misplaced.

## IV.

■ Plaintiff's claim against WMATA is based upon the fact that it did not deduct McCamey's Plan contributions from her workers' compensation checks during the period that she was on disability leave. Plaintiff contends that WMATA was under an obligation to make such deductions and that its failure to do so resulted in McCamey losing her rights under the Plan.

Plaintiff relies upon Section 2(d) of the Plan which provides that WMATA has no duty to collect contributions from any member not receiving "compensation" from WMATA. Plaintiff contends that the term "compensation" as used in this section en-

---

1. If federal law did apply, I would reach the same conclusion that I am reaching under Maryland law. A labor organization is prevented by statute from limiting the right of any of its members "to institute any action in any court." 29 U.S.C. § 411(a)(4); *see Moore v. Local 569, International Brotherhood of Electrical Workers,* 53 F.3d 1054, 1056–58 (9th Cir.1995). Similarly, although I know of no case directly on point, I would be extremely reluctant to uphold any provision in an ERISA plan that insulated the plan fiduciaries from judicial review of arbitrary and capricious actions. Such a holding would be in direct derogation of this court's equitable power and would prevent this court from ensuring that trustees fulfill their fiduciary duties.

compasses workers' compensation and that WMATA therefore was under a duty to deduct contributions from her workers' compensation checks. This contention flatly ignores the express requirement contained in Section 2(c)(1) that "[m]embers not receiving wages, vacation pay, or sick leave pay from the Authority shall be responsible for the payment of their individual contributions." Plaintiff does not suggest that McCamey was receiving "wages, vacation pay or sick leave pay" from WMATA while she was on disability leave receiving workers' compensation. Thus, by the clear terms of the Plan it was her responsibility to pay her own contributions directly to the Plan during the period of her disability. WMATA had no duty (indeed no right) to make any deductions from McCamey's workers' compensation for the purpose of paying her Plan contributions.[2]

## V.

Plaintiff has articulated four theories of recovery against the Plan. First, plaintiff claims that the January 4, 1991, letter sent by the Plan to his wife was insufficient to effect suspension of benefits. Second, he asserts that the Trustees' decision to deny his claim was arbitrary and capricious. Third, plaintiff alleges that the Trustees have breached their fiduciary duty by contracting for "experience rated" life insurance that creates an incentive for them to deny claims. Fourth, he argues that the Plan is equitably estopped from relying on the terms of the Plan agreement to deny his claim.

## A.

■ Plaintiff first argues that the letter sent to McCamey on January 4, 1991, notifying her that her Plan benefits had been suspended for nonpayment did not in fact effect such a suspension. The letter informed McCamey that "[y]ou are hereby advised that we are suspending the hospital, surgical, medical, dental, Life and ADD Insurance coverage, Weekly Disability Benefits coverage and all other benefits to which you and your family have been entitled to through the Health and Welfare Plan as of the date noted below." No date was listed below. Plaintiff argues that the letter therefore reasonably should be interpreted to mean only that as of January 4, 1991, McCamey's benefits were subject to termination at some future date.

Unquestionably, the letter could have been more carefully prepared. However, Section 2(h) of the Plan itself cannot be more explicit: "In cases where members' contributions shall be made by means other than payroll deductions, coverage as to any member shall cease upon the expiration of thirty (30) days from the due date of any unpaid contributions." The failure to insert an effective date in the notification letter did not and could not amend this provision of the Plan itself. Whether the omission of an effective date created an ambiguity that misled McCamey and plaintiff is a separate question that is discussed *infra* section V.D. However, under the terms of the Plan, McCamey's coverage had lapsed, and the letter did not alter this fact.[3]

■ Plaintiff also contends that the January 4, 1991, letter was ineffective because it was signed by Mary Andrusko, the Adminis-

---

**2.** Plaintiff makes a subsidiary argument that the regulation requiring members on disability leave to directly pay Plan contributions did not become effective until April 1, 1992, and that it represented a reversal of policy. In support of this claim, plaintiff has produced two documents: minutes of a meeting of the Trustees on January 27, 1992, and a copy of the relevant Plan regulation bearing an effective date of April 1, 1992. In response, WMATA has submitted the affidavit of Mary Andrusko, the Administrative Assistant to the Trustees. Andrusko has the responsibility for preparing the minutes of all of the meetings of the Trustees. She avers in her affidavit that the workers' compensation policy has not changed since 1985 and that the Trustees did not discuss workers' compensation at the January 27, 1992, meeting. Plaintiff has presented no evidence to contradict this averment. Read in the context of Andrusko's affidavit, it is clear that what occurred at the January 27, 1992 meeting is that the Trustees changed another rule within the ambit of the regulation (pertaining to an issue regarding the payment of back dues) and that it was this change that led to the amendment of the regulation that carried with it a new effective date.

**3.** The Plan has also presented uncontradicted evidence that the Plan's insurance carriers in fact dropped McCamey as a beneficiary as of January, 1991.

trative Assistant to the Trustees, and not by the Trustees themselves. He argues that this constituted an improper delegation of the Trustees' responsibilities. This argument likewise is without merit. Section 6(i) of the Plan grants the Trustees the power to hire employees to assist them in the administration of the Plan, and Section 4(c) allows bonded employees (such as Andrusko) to sign papers on behalf of the Trustees. Thus, Andrusko was fully authorized to sign and send the January 4, 1991, letter.

### B.

■ The plaintiff's next claim is that the Trustees' decision to deny him benefits was erroneous under the terms of the Plan. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1988), the Supreme Court held that courts are to employ an "arbitrary and capricious" standard to review ERISA plan benefit determinations where a plan expressly confers discretion to its trustees. *Id.* at 115, 109 S.Ct. at 956–57. Although ERISA does not apply here, *see supra* section III.A, the court's analysis in *Firestone* relied on traditional principles of trust law, explaining that "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." *Id.* at 111, 109 S.Ct. at 954 (quoting *Restatement (Second) of Trusts* § 187 (1959)); *see also Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1006 (4th Cir.1985) (noting traditional use of arbitrary and capricious standard in diversity cases involving challenges to decisions of trustees). Section 6(c) of the Plan grants the Trustees the authority "[f]inally and conclusively to determine ... the eligibility of members for ... benefits ... and, if eligible, the amount of such benefits." Therefore, the Trustees' decision may be reversed only if plaintiff can show that the denial of his claim was arbitrary and capricious.

Plaintiff attempts to make this showing by pointing to evidence of other Plan members who, though owing past due contributions, were not terminated from the Plan. As the Plan points out, however, plaintiff has not produced any evidence to show that they were comparably situated to McCamey, i.e., that they were, in fact, suspended and that, if they were, they did not make arrangements with the Plan to become reinstated (as McCamey did not). Since plaintiff has the burden of proof on the issue, the lack of evidence is fatal to his claim. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### C.

■ Plaintiff's next attack is based on a letter to the Trustees dated October 21, 1994, advising them that "favorable experience" with the Plan's 1994 claims for life benefits resulted in a dividend for the Plan in the amount of $147,761. In other words, the Plan benefitted because it paid less in claims than had been forecast. Plaintiff alleges that the use of such "experience rated" life insurance creates an incentive for the Trustees to deny life benefit claims, and that this is a conflict of interest that breaches the Trustees' fiduciary duty to Plan members.

Plaintiff relies on *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). *Brown* is clearly distinguishable because it involved a trustee that both decided benefits claims and paid for those claims out of its own assets. Here, the Trustees contracted (as they were required to do under Section 3(a)(1) of the Plan) for group life coverage through a third party insurer. They receive no pecuniary benefit from life dividends returned to the Plan, and their decision to purchase experience rated insurance was well within their discretion. *Cf. De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1191 (4th Cir.1989).

### D.

■ The Plaintiff's final claim is that the plan is estopped from denying that McCamey's benefits were in force at the time of her death. An estoppel arises when a party makes a misleading representation to another who relies on it to his detriment.

*Heckler v. Community Health Servs.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984). It is not necessary that the party making the misleading representation have done so intentionally or even negligently. *See Knill v. Knill,* 306 Md. 527, 510 A.2d 546, 549–50 (1986). *See generally Restatement (Second) of Torts,* § 894(1) cmt. b (1977). It is necessary, however, that the reliance by the person asserting the estoppel must have been reasonable. *Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223–24.

Here, there were ambiguities in the Plan's letters to McCamey that may have been somewhat misleading. The omission of an effective date has been mentioned above. Moreover, both the November 16, 1990, and the January 4, 1991, letters that the Plan sent to McCamey contained the following language: "The collective bargaining agreement requires that you remain a member of the Plan and pay dues as long as you are a WMATA employee. If you do not resume payment of Health and Welfare dues and pay dues you already owe, this money must be deducted from your paycheck in the event you return to work." The Plan regulation requiring workers on disability leave to directly pay contributions concluded with a similar warning: "If you are cancelled for non-payment you will not be eligible to participate in the Plan until you return to work as an active employee." It is undisputed that payroll deductions resumed without any action by McCamey when she returned to work in 1992.

Plaintiff argues that the first quoted sentence's language that the collective bargaining agreement requires all employees to be Plan members created the perception that McCamey would automatically be reenrolled when she returned to duty. The second sentence refers both to resuming payment of dues as well as paying dues already owed, warning that "this money" would be deducted upon return to work. Plaintiff asserts that this sentence therefore implies that any future deductions would cover *both* past due as well as current contributions. Plaintiff concludes that the fact that Plan deductions in fact resumed automatically, in amounts higher than before, confirmed this belief.

Plaintiff's contention on this point is sufficiently meritorious that it at least raises a question as to whether the Plan made misleading statements. However, that satisfies only the first of the elements that plaintiff must meet in order to establish an estoppel. Evidence of the second—reliance—is entirely missing. Plaintiff has presented absolutely no evidence (not even his own affidavit) that he and his wife refrained from purchasing other life insurance because they believed that McCamey was covered under the Plan. Indeed, the only evidence in the record suggests that plaintiff and McCamey did not rely upon any statements made by the Plan in making their insurance decisions. In that regard defendants have presented evidence that plaintiff added his wife to his own health coverage early in 1991, that they maintained that coverage until McCamey's death, and that she did not attempt to file claims for health benefits under her own Plan at any time after January, 1991.[4]

For these reasons I find that defendants are entitled to the summary judgment that they seek. A separate order effecting the rulings made in this memorandum is being entered herewith.

---

4. Even if plaintiff had presented evidence of reliance, an issue is presented as to whether any such reliance would have been reasonable. It would seem that any reasonable person having received the January 4, 1991, letter would have made inquiries as to the status of her benefits if she desired to maintain them. That is particularly so since the January 4 letter expressly states that "Your reinstatement can be effected by payment of delinquent dues. You must appear in person at the office of the Plan to apply for such reinstatement."