**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 14 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROY BILL CRAWFORD,

    Defendant - Appellant.

No. 00-3128

D. Kansas

(D.C. No. CR-99-20071-001)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO** and **ANDERSON** , Circuit Judges, and **MILLS,** [**] District Judge.

---

Roy Bill Crawford was convicted following a jury trial on one count of

robbing a bank in violation of 18 U.S.C. § 2113 (a) and (d) and one count of

using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1).

He raises two arguments on appeal. First, he contends that the district court erred

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

in admitting the eyewitness identification testimony of Quintin Ostrom because it was the product of an unduly suggestive pretrial identification process. Second, he claims that the district court erred in denying his motions for a mistrial and a new trial after inadmissible evidence of another crime was inadvertently introduced at trial by a witness for the government. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I. BACKGROUND

On August 9, 1999, the Gold Bank in Shawnee, Kansas, was robbed. Quintin Ostrom, the bank's vice president, invited the perpetrator to a private conference room after the perpetrator stated that he was interested in obtaining a small business loan. Once inside the conference room, the perpetrator handed Ostrom a note stating that bombs had been planted in the bank and would be detonated by accomplices if any alarms were triggered. The perpetrator then brandished a handgun and handed Ostrom 25 large manilla envelopes and told him to fill them with money.

Ostrom left the conference room and filled two of the envelopes from the open teller drawers. He returned to the conference room several times and discussed with the perpetrator his inability to access the bank's vault. The perpetrator became increasingly irritated and told Ostrom to find a way to get into

the vault so he could fill the remaining envelopes with money. Eventually, another bank employee, Kelly Bartels, returned from lunch and was able to open the vault. Ostrom filled the remaining envelopes mostly with one and five dollar bills from the vault and he and Bartels carried them to the conference room and gave them to the perpetrator. As he was leaving, the perpetrator advised Ostrom to evacuate the building because of the bombs he claimed were inside.[1] Ostrom did so.

When Ostrom gave the evacuation order, Julie Green, a bank employee, exited the building through the back door and observed the perpetrator get into and drive away in a white, "four door, older style, like a Chevy Cavalier type of a car." Appellant's App. Vol. I at 161. Green could not read the license plate because it was dirty. Id. at 165. The bank determined that over $26,000 had been taken, including $13,300 in one dollar bills.

Late in the afternoon of August 9, 1999, Defendant made cash deposits into his business account and his personal account. The two deposits together included 205 one dollar bills. Id. at 401-03. The teller at the drive-through window at Defendant's bank observed that he had a considerable amount of money in his wallet. Id. at 404. Around noon on August 10, 1999, Defendant again made cash deposits to two of his accounts. They included a total of 537 one

---

[1]Upon inspection, no bombs were found.

dollar bills.  Id. at 411-12.  That same day, Defendant purchased a Colt .45 handgun and some ammunition from Pat's Pawn & Gun Shop in Ogden, Kansas. Patrick Livingston, the owner of the gun shop, testified that Defendant paid the $584.68 purchase price with small denomination bills, including two or three hundred one dollar bills.  Id. at 426.  Livingston also observed that Defendant retrieved the money from a blue bag in which he saw more cash.  Id.

On August 10, 1999, the police learned that the week prior to the robbery, Vonda Schnelle, a Gold Bank employee from another office, had stopped by the Shawnee branch to drop something off.  Upon arriving, she noticed a man sitting in a car outside the bank looking into the bank.  When she left, he was still there. Because she was suspicious of the man, she wrote down the car's license plate number and a description of the car and the man inside.  Her notes indicate that the Kansas license plate was either AXL or HXL 602, the car was a white Chevy Cavalier, and the occupant of the car was a white male with a beard.  Id. at 189.

That same day, the police discovered that there was no license plate AXL 602 in Kansas, but there was a license plate HXL 602 issued to a 1984 Chevy Cavalier.  The car was registered to Helen Proctor, Defendant's mother.  Proctor informed police that her son had been driving the Cavalier for the past six weeks while he had been living with her and that he was driving it on August 9, 1999. Id. at 209.  Police returned to Proctor's home that evening and questioned

Defendant, who claimed that he was running errands in Topeka during the time of the robbery. Id. at 216.

On August 11, 1999, the police arrested Defendant at his mother's home in Holton, Kansas. Police also obtained search warrants for Defendant's home in Topeka and for his mother's home in Holton. At the Holton home, the police found $3359 in cash, most of which was hidden in a garage loft. Id. at 307-09. The Colt .45 Defendant purchased on August 10, 1999, was also seized during the search of the Holton home. Neither the gun allegedly used in the robbery nor the balance of the money taken from the bank was found.

Defendant appeared in the United States Magistrate Court for the District of Kansas on October 1, 1999, for an omnibus hearing and arraignment. Ostrom, as the victim of a crime, was notified of the hearing pursuant to 42 U.S.C. § 10606(b)(3). After attending the hearing, Ostrom told the FBI that he was positive that Defendant was the man who robbed the bank. When Defendant learned that Ostrom had identified him as the bank robber, he filed a Motion to Exclude Eyewitness Identification. After a hearing, the district court denied his motion.

Defendant also filed a motion in limine seeking to exclude evidence relating to some marijuana that was found during the search of his residence. The United States did not oppose the motion and represented to the district court that

it did not intend to attempt to introduce any evidence regarding the marijuana. Based on those representations, the district court declared the motion to be moot. The case then proceeded to trial.

In addition to the presentation of the evidence discussed above, the following occurred at trial: (1) Defendant was identified as the perpetrator of the bank robbery by eyewitnesses Quintin Ostrom and Kelly Bartels. Appellant's App. Vol. I at 100, 149; (2) Gary Strong, the owner of the building in which Defendant's sandwich shop was located, testified that Defendant's business was struggling financially by June of 1999. Id. at 56; (3) Chadrick Rogers, a man incarcerated with Defendant, testified that Defendant told him the details of the robbery, that he was guilty, but planned on going to trial anyway, that he had grown a beard and used red dye in his hair and beard, that he had shaved off his beard immediately after the robbery, that he brandished a gun during the robbery, that he stole over $26,000 from the Gold Bank, that he got caught because of the license plate on his car, that the bank vice president should not be able to recognize him because his hair was shorter and he had a beard at the time of the robbery, and that at trial he was planning to present an alibi that he was eating lunch with his wife and mother at his mother's house at the time of the robbery. Appellant's App. Vol. II at 446-50, 458; and (4) Christopher Nemmers, another fellow prisoner of Defendant, testified that Defendant also told him about the

-6-

robbery, that he got about $25,000 from the bank, that he was not able to get into the bank vault immediately, that he used some of the money to buy a .45 caliber handgun, that he deposited some of the smaller bills into a bank account and that he planned to get some of his family members to corroborate a story that he was at the dinner table when the robbery took place. Id. at 481-83. After the jury found him guilty on both counts, Defendant was sentenced to a total of 141 months in prison and ordered to pay $23,355.82 in restitution. This appeal followed.

## II. DISCUSSION

### A. Eyewitness Identification

Defendant challenges the district court's decision to allow Ostrom's in-court identification on due process grounds claiming that the unduly suggestive pretrial setting in which Ostrom first identified Defendant as the bank robber created a strong likelihood of unreliability. "Whether identification procedures are violative of due process is a legal question reviewed de novo." United States v. Brown, 200 F.3d 700, 707 (10th Cir. 1999), cert. denied, 120 S. Ct. 1213 (2000) and 120 S. Ct. 1706 (2000).

"The admission of in-court identification testimony violates due process only when, under the totality of the circumstances, it was tainted by unnecessarily

suggestive pretrial identification procedures creating a 'very substantial likelihood of misidentification.'" Id. (quoting United States v. Smith, 156 F.3d 1096, 1051 (10th Cir. 1998)). Even if the pretrial identification procedures are impermissibly suggestive, the identification evidence or testimony may be admitted at trial if, under the totality of the circumstances, the identification was reliable. Neil v. Biggers, 409 U.S. 188, 198-99 (1972). Because the United States concedes that the pretrial identification procedures used in this case were unduly suggestive, we proceed directly to the reliability analysis.

In determining whether Ostrom's identification of Defendant as the bank robber is reliable notwithstanding the unduly suggestive setting in which it first took place, we follow the guidance of The Supreme Court:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Id. at 199-200.

The record shows that Ostrom had a significant amount of time in which to view the perpetrator of the bank robbery. Ostrom testified that the robbery lasted approximately 25 minutes and that the time he actually spent with the perpetrator in the conference room during the robbery was between five and ten minutes. Appellant's App. Vol. II at 804-05. After reviewing the record we agree with the

-8-

district court that "it's clear that [Ostrom] had ample opportunity . . . to speak with the perpetrator face to face, to observe his build, his demeanor, his personal characteristics, and such matters as race, stature, age, sex, hair color, eye color, et cetera." Id. at 842. In addition, the detail of Ostrom's testimony as to the sequence of events, what the perpetrator was wearing, the bags he was carrying and what he said to Ostrom during the robbery indicate that Ostrom was highly attentive during the robbery.

Despite his high degree of attention, Ostrom's description of the perpetrator, if the perpetrator was, in fact, Defendant, was not perfect. Ostrom stated that the perpetrator had dark eyes and appeared to have some acne scarring. In fact, Defendant has blue eyes and no apparent acne scarring. However, the rest of Ostrom's description was largely accurate. For example, he described the perpetrator as a white male in his mid forties that was about 6'0 tall with dark reddish hair and a beard and mustache. Appellant's App. Vol. I at 99-100. There was testimony at trial indicating that Defendant had disguised himself by coloring his hair red and growing a beard and mustache. That evidence makes it entirely possible that Ostrom's description of the perpetrator was accurate even though Defendant was clean shaven when he was apprehended. Based on our review of the record, we conclude that Ostrom's description of the Defendant following the robbery was reasonably accurate.

-9-

The record shows, and both parties agree, that Ostrom displayed a high degree of certainty when he identified Defendant as the perpetrator of the bank robbery. Lastly, the period of time between the crime, which occurred on August 9, 1999, and Ostrom's identification of Defendant at his omnibus hearing on October 1, 1999, is not impermissibly lengthy.

Based on the foregoing analysis of the five <u>Biggers</u> factors, we conclude that Ostrom's identification was reliable notwithstanding the overly suggestive circumstances in which it was first made. Therefore, we hold that the district court did not err in denying Defendant's motion to exclude Ostrom's identification.

## B.    Denial of Motions for a Mistrial or New Trial

Defendant next argues that the district court erred in denying his motions for a mistrial or a new trial after inadmissible, prejudicial evidence was inadvertently introduced through the stray comment of a government witness. We review both the denial of a motion for a mistrial and a motion for a new trial for an abuse of discretion.[2] <u>United States v. McKissick</u>, 204 F.3d 1282, 1299 (10th

---

[2]Defendant claims that the district court's actions in dealing with the inadvertently introduced marijuana testimony have constitutional implications and urges us to engage in a harmless constitutional error analysis. After full consideration, we have concluded that no constitutional error took place, noting,

(continued...)

Cir. 2000) (mistrial); <u>United States v. Byrne</u>, 171 F.3d 1231, 1235 (10th Cir. 1999) (new trial).

When Defendant's home was searched, the police found a half pound of marijuana. Realizing that evidence of the marijuana would be inadmissible both as irrelevant and more prejudicial than probative, the United States did not oppose Defendant's motion in limine to exclude that evidence. The government also, as indicated above, represented that it did not intend to attempt to introduce any evidence concerning the marijuana. In response to a question about what Defendant had told him about a particular court hearing, Chadrick Rogers, a witness for the government, stated, "[h]e had a court hearing here that they were trying to suppress some evidence. One of the big things of the evidence was they found half a pound of marijuana in his house." Appellant's App. Vol. II at 453. Counsel for the United States stopped Rogers in mid-sentence and asked to approach the bench. Defendant moved for a mistrial. The district court denied the motion and immediately issued a lengthy curative instruction to the jury charging it to completely disregard the statement about the marijuana.[3] Id. at 455-

---

[2](...continued)
however, that even if a constitutional error had occurred, it would have been harmless beyond a reasonable doubt due to the overwhelming evidence of Defendant's guilt contained in the record.

[3]The district court instructed the jury as follows:

(continued...)

-11-

A jury is presumed to follow the instructions it receives. United States v. Castillo, 140 F.3d 874, 884 (10th Cir. 1998).

This situation is similar to the one we faced in United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998). In Brooks, a witness for the government was testifying as to a meeting with the defendant in order to establish that the witness could identify the defendant and recognize his voice. The nature of the meeting was not supposed to be presented to the jury, but the witness blurted out a statement indicating that the meeting was a drug buy. Id. at 1244. Government counsel immediately stopped the witness. The district court issued a cautionary instruction and denied the defendant's motion for a mistrial. Id. We upheld that action on appeal after determining that it was within the discretion of the district court. Id. at 1245.

---

[3](...continued)
Members of the jury, with regard to that last bit of testimony, I want you to understand that in this trial you will not be hearing any evidence which connects Mr. Crawford in any way with any marijuana that was allegedly found in his home. The Court was aware of this matter before trial and, in fact, had entered an order that the attorneys not bring it up in any way because we did not want this to improperly influence your verdict since you won't be hearing any evidence which connects it with Mr. Crawford.

Therefore, I'm going to strike this evidence and instruct you that you need to totally disregard it and we'll move on with the rest of this witness' testimony.

Appellant's App. Vol. II at 457.

Defendant attempts to distinguish <u>Brooks</u> stating that in that case, "the challenged evidence was determined relevant for purposes of identification of the defendant. Therefore, the 'stray remark' was not, per se prejudicial." Appellant's Reply Br. at 5. We disagree. The stray remark and the challenged evidence in <u>Brooks</u> (that the meeting was a drug buy) was not admissible for any purpose. It was the fact that a meeting between the witness and the defendant had taken place that was being used to establish identity. The purpose of the meeting, however, was probably being withheld from the jury because the defendant in <u>Brooks</u> was charged with selling drugs. After carefully reading <u>Brooks,</u> we are unable to distinguish it from the case at bar.

In light of the district court's superior perspective in assessing the effect of Rogers' stray remark and the strong cautionary instruction given, we conclude that the district court did not abuse its discretion when it denied Defendant's motions for a mistrial or a new trial. <u>See</u> <u>Brooks</u>, 161 F.3d at 1245.

## III. CONCLUSION

After thoroughly examining the record and carefully analyzing Defendant's claims on appeal, we conclude that Defendant has failed to demonstrate the occurrence of any reversible error during his trial. Accordingly, we AFFIRM his conviction and sentence.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge